UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-CR-293 (JRT)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | GOVERNMENT'S POSITION |
| v. ) | WITH RESPECT TO SENTENCING |
| ) | |
| CHRISTOPHER DOUGLAS WOOD, ) | |
| ) | |
| Defendant. ) | |

The United States of America, by and through its attorneys Erica H. MacDonald, United States Attorney for the District of Minnesota, and Assistant United States Attorney Charles J. Kovats, Jr., hereby submits its position with respect to the sentencing of Christopher Douglas Wood ("Wood" or "defendant").

## I.   THE CASE AGAINST DEFENDANT WOOD

### A.   The Charge of Conviction

On December 17, 2018, defendant Christopher Douglas Wood pleaded guilty to Count 1 of the Information which charges him with Possession with the Intent to Use a Firearm in a Federal Facility, in violation of 18 U.S.C. § 930(b). This offense carries a statutory maximum sentence of five years' imprisonment, a three-year term of supervised release, a $250,000 fine, and a $100 special assessment.

### B. The Defendant's Offense Conduct

#### 1. The Factual Basis Agreed to by the Parties

In the plea agreement, the parties stipulated to the following facts:

On the night of July 21, 2018, during the Aquatennial Fireworks display, the defendant fired three shotgun rounds at the Federal Reserve Bank ("FRB") in downtown Minneapolis, from his Mossberg shotgun. The rounds fired by the defendant were "slugs" that caused more than $40,000 in property damage to the windows and façade of the FRB. Further, one of the slugs penetrated the triple-pane security windows and was later located in the ceiling of a seventh floor office of the FRB.

The defendant fired these shots from the United States Postal Service ("USPS") facility on South First Street – directly across Hennepin Avenue from the FRB. At the time of the shooting, the defendant was an employee of the USPS and had access to the secure parking structure from which he fired the shots. As a postal employee, the defendant knew he was prohibited from bringing a firearm into the USPS facility and was aware that numerous signs alerted both employees and the public that firearms were prohibited from the USPS facility. Despite knowing it was unlawful to bring a firearm to work, the defendant admits that on July 21, 2018, he did so anyway.

#### 2. Other Relevant Conduct Described in the Presentence Report

During the course of the investigation, officers from Minneapolis Police Department conducted a search of the defendant's residence and recovered a loaded 12-gauge shotgun, a .22 semiautomatic handgun with a loaded magazine, a Snake Slayer pistol, ammunition,

and literature critical of the FRB ("END THE FED"). (PSR ¶ 9). In the trunk of the defendant's vehicle, the police also found a 9-millimeter handgun with loaded magazines and more literature of a similar nature. (*Id*).

### C. The Pertinent Guideline Calculations Agreed to by the Parties

In the plea agreement, the parties agreed the following Guideline calculations applied to the present case:

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2B1.1(a)(2): | 6 |
| Property Damage > $40,000, U.S.S.G. § 2B2.1(b)(1)(D): | +6 |
| Offense Involving a Firearm, § 2B1.1(b)(16): | +2 |
| Acceptance of Responsibility, § 3E1.1(a): | -2 |
| Total Offense Level: | 12 |

The parties agreed that no other specific offense characteristics or adjustments should apply. Finally, the parties also agreed the defendant's criminal history category would likely be I.

Because the PSR provides a sufficient record of the defendant, his background, and his conduct, and because there is no dispute about the guideline calculation, the government does not believe an evidentiary hearing is necessary.

### II. THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On March 8, 2018, the United States Probation Office disclosed the PSR in this case. The PSR calculates the defendant's applicable guideline range at 10-16 months' imprisonment, based on a total offense level of 12, criminal history category I, and a

statutory maximum sentence of 5 years' imprisonment. (PSR ¶¶ 63 - 64). The PSR also sets forth the statutory maximum period of supervised release (3 years), fine range ($5,500 - $55,000), and probation (5 years). (PSR ¶¶ 66, 68, 72). The PSR also notes that these calculations place the defendant in Zone C of the Sentencing Table. (PSR ¶ 69).

The government has no objections to the factual statements or the Guidelines calculations contained in the PSR and notes that the calculations are in harmony with those agreed to by the parties.

### III.   THE GOVERNMENT'S APPLICTION OF 18 U.S.C. § 3553(a)

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine a sentence sufficient, but no greater than necessary, to achieve the goals of 18 U.S.C. § 3553. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently

compelling to support the degree of the variance." *Id.* Before imposing a sentence of the defendant, § 3553(a) requires the Court to analyze "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."

### A. Nature and Circumstances of the Offense.

The defendant committed a serious offense when he brought a firearm to the United States Post Office facility and fired three shotgun blasts at the Federal Reserve Bank (FRB) on the night of the 2018 Aquatennial. (PSR ¶¶ 7-9). When doing so, he placed in jeopardy the lives of the employees and staff at the FRB, as well as those enjoying the Aquatennial celebration in the vicinity of the FRB. According to a FRB official, the FRB is occupied "24 hours a day" and, on the night of the shooting, other employees were "observing [the] fireworks demonstration." (PSR ¶ 11). The defendant's shots – certainly poorly aimed from such a distance – pierced the windows of the FRB and could have caused serious injury, or worse, to innocent bystanders. (*Id*).

To his credit, the defendant accepted responsibility for his crimes once apprehended and agreed to a pre-indictment resolution. He also acknowledges the seriousness of his conduct in his statement to the Probation Officer ("the defendant struggled to comprehend what would have happened if his actions would have harmed or killed someone.").

5

However, his acknowledgment, though important, does not diminish the seriousness of the offense and the risk of serious injury or death his actions presented to the public.

### B. History and Characteristics of Defendant.

The defendant was born in Osceola, Wisconsin, and had the benefit of growing up in a generally supportive family. (PSR ¶¶ 38, 40). He moved to the St. Paul metro area at a young age where he has remained to the present day. (PSR ¶ 42) The defendant was schooled both at home and in area public schools and successfully graduated high school in 1994. (PSR ¶ 54). In 1998, he began work at the United States Post Office facility in Minneapolis, Minnesota. He remained so employed on a full-time basis until placed on leave following the shooting that serves as the basis for the present conviction. (PSR ¶ 58).

The PSR notes the defendant has suffered from health concerns that have plagued him for some time. (PSR ¶¶ 45-47; 48-49). He also has used/abused both alcohol and marijuana products but, to his credit, apparently has decreased his alcohol consumption and ceased his use of marijuana since his arrest. (PSR ¶ 50-51). All chemical tests submitted by the defendant while on pre-trial release were "clean." (PSR ¶ 52).

Notably, the defendant's conviction on the present offense represents the defendant's first criminal conviction. (PSR ¶ 33). He has otherwise lived a law-abiding and productive life. Unfortunately, the defendant recently found himself obsessively chasing conspiracy theories (FRB, 9/11, etc.) in the fever-swamps and dark corners of the internet. (PSR ¶¶ 9, 13). Evidently, the defendant found himself with such inexplicably

strong feelings of dislike toward the FRB – strong enough to cause him to act in violence toward the FRB – despite routinely encountering its employees in the mailroom on a regular basis. (PSR ¶¶ 11, 13).

### C. A Guidelines Sentence Will Address the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

As best as the government can see from the record, the defendant's conduct on the night of the shooting is an aberration from the rest of his life. That said, what makes it "aberrant" is the seriousness of the offense. And a serious offense should be met with a correspondingly serious sanction. In the government's view, a Guidelines' sentence appropriately reflects the seriousness of the offense and provides just punishment for the defendant.

### D. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

A guidelines sentence also will protect the public from the defendant, especially if the Court accepts the FRB's recommendation to include a "no contact with the FRB" provision in the conditions of the defendant's supervised release. The government respectfully requests the same condition by imposed. Finally, the Court should require the defendant to provide financial restitution to the FRB in the amount of $40,242.

### IV. CONCLUSION

The Court should impose a sentence that adequately addresses the §3553(a) factors and is not longer than necessary to achieve their objectives. In the government's view, a

7

guidelines sentence appropriately punishes him, protects the public, and avoids unwanted sentencing disparities.

Dated: March 22, 2019 	Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

/s/ *Charles J. Kovats, Jr.*
_____
CHARLES J. KOVATS, JR.
Assistant United States Attorney