| UNITED STATES DISTRICT COURT | DISTRICT OF MINNESOTA |
|---|---|

NO. 0864 0:18CR00293-001(JRT)

UNITED STATES OF AMERICA,
        Plaintiff,
  -v-

**SENTENCING MEMORANDUM**

CHRISTOPHER DOUGLAS WOOD,
        Defendant.

## INTRODUCTION

Defendant, Christopher Wood, respectfully submits this memorandum in support of his position at sentencing following his guilty plea for Possession with the Intent to Use a Firearm in a Federal Facility During the Commission of a Crime under 18 U.S.C. § 930(b), a Class D Felony. His offense was an aberration from an otherwise quiet, law-abiding life. Prior to July 2018, Mr. Wood maintained steady employment and had no criminal history. He has remained compliant with all pre-trial release conditions, accepted responsibility for his criminal offending, and fully cooperated with the investigation and legal proceedings. Mr. Wood is addressing the underlying causes of his behavior in individual mental health therapy. In light of his individual background, compelling personal circumstances, and acceptance of responsibility, a sentence requiring payment of restitution and a probationary sentence is "sufficient, but not greater than necessary" to fulfill the goals of sentencing established by Congress. 18 U.S.C. § 3553(a).

1

I. **PERSONAL BACKGROUND**

Mr. Wood had, in many respects, a secure, middle class upbringing. He was born in Osceola, Wisconsin and raised in the Twin Cities metro area. His parents have been married his entire life. Mr. Wood's father worked in law enforcement for 32 years, spending most of that time in undercover narcotics as a Ramsey County Sheriff Deputy. His mother worked in hospice and home health care for 23 years. He has an older sister and a younger brother. Mr. Wood's relationships with his entire family have always been close and supportive. As evidenced by the included letters of support, they still are today.

Growing up, Christianity was a strong, guiding force throughout Mr. Wood's childhood. His family attended church, and his parents provided him a religious-based education. Mr. Wood went to public elementary school until the third grade but, after a classmate of his was caught smoking, his parents decided to homeschool with the education assistance of their church. Mr. Wood was educated at home from fourth grade through eighth grade. He transitioned to a very small, private high school in ninth grade. There, he played soccer and sang in the choir. He was a B average student. In 1994, Mr. Wood graduated from Chisago Lake Baptist School.

Following school, Mr. Wood worked a variety of part-time factory and industrial jobs and continued to live at his parent's home. In 1997, he moved to Minneapolis with a girlfriend and lived with her until their relationship ended in 2000. He began his employment with the United States Post Office in 1998, initially as a part-time, flexible-status automation clerk until eventually earning full-time employment. Mr. Wood sorted

letters at the Central Post Office in downtown Minneapolis for 17 years before becoming a registered mail clerk in 2015. As a mail clerk, Mr. Wood worked the second shift from 3:00–11:00 p.m. at least 40 hours per week. The area of the Central Post Office where he worked was locked from the outside, which he considered dangerous given that he was left alone, essentially left in a locked safe without access to a phone and with no contact with other staff for the entirety of his work shift. In addition to safety concerns, Mr. Wood described his 20 year career at the post office as "robotic" and "soul-sucking." Management monitored exactly how long it took staff to complete a task; all breaks, including those to the restroom, were required to be clocked and measured in hundredths of an hour. "Everyone was there for the money. You could see the deterioration of everyone's mental health," Mr. Wood said of his colleagues. He did not realize the slow compromise of his own mental health until forced to confront it with the present offense.

Mr. Wood's medical condition, idiopathic thrombocytopenic purpura (ITP), intensified his safety concerns at work and overall unhappiness with his employment. According to Mayo Clinic, ITP is an often chronic and sometimes life-threatening disorder that can lead to easy or excessive bruising and bleeding.[1] The bleeding results from unusually low levels of platelets or blood clotting cells.[2] Mr. Wood also struggled with insomnia and depression secondary to his ITP diagnosis. Although he received eight years of medical treatment for ITP, the side effects of his treatment were more debilitating than

---

[1] Mayo Clinic, *Idiopathic Thrombocytopenic Purpura*, (August 09, 2017), retrieved from https://www.mayoclinic.org/diseases-conditions/idiopathic-thrombocytopenic-purpura/symptoms-causes/syc-20352325 on March 24, 2019.
[2] Id.

3

the disease itself. His Prednisone therapy, for example, resulted in his suicidal ideation. Hopeless and helpless with the stress of his health and work, Mr. Wood self-medicated with alcohol which brought him positive feelings and relaxation in the short-term. He drank heavily from 2010-2014 but gradually cut back on alcohol following his hospitalization for a kidney stone in 2014. Around the same time Mr. Wood struggled more to overcome his depression and felt a loss of control of his own life. He isolated and, without noticing it, fell into what he described as an addiction to conspiracy theories. Reflecting on the events leading up to his offense, Mr. Wood explained: "I became addicted about what's true and what's false…who is wrong and who is right…I started to believe I was at the bottom and that the Fed [Federal Reserve System] was at the top and it made me feel small and powerless in a messed up world."

## II.     THE SENTENCING GUIDELINES: 18 U.S.C. §3553(a)

Mr. Wood's sentence must be driven by the overarching command of 18 U.S.C. § 3553(a), which instructs courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. Kimbrough v. United States, 552 U.S. 85, 89 (2007). The guidelines are advisory and in no sense does a guidelines calculation provoke a presumption that the attendant sentence is appropriate, let alone required. *See* Gall v. United States, 552 U.S. 38, 45 (2007). In fact, courts "may not presume that the Guidelines range is reasonable" or that only "extraordinary circumstances … justify a sentence outside the Guidelines range." United States v. Cavera, 550 F.3d 180, 189, 199 (2nd Cir. 2008) (quoting Gall, 552 U.S. at 47); *see* Nelson v. United States, 555 U.S. 350,

350 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); Rita v. United States, 51 U.S. 338, 351 (2007) (stating that a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). The Supreme Court has recently clarified the role of the guidelines in sentencing as follows:

> … First, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (citation omitted). The district court must then consider the arguments of the parties and the factors set forth in § 3553(a). Id., at 49–50, 128 S.Ct. 586. The district court "may not presume that the Guidelines range is reasonable," id., at 50, 128 S.Ct. 586; and it "may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views," Pepper v. United States, 562 U.S. --, --, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196 (2011) (citing Kimbrough v. United States, 552 U.S. 85, 109–110, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)). The district court must explain the basis for its chosen sentence on the record. Gall, 552 U.S., at 50, 128 S.Ct. 586.

Peugh v. United States, 569 U.S. 530, 536-37 (2013).

The Court is well familiar with the sentencing considerations set forth in 18 U.S.C. § 3553(a). The requirement is that of a case by case analysis, which in some instances means that it is appropriate to defer to the guidelines and inappropriate in others:

> The District Court may determine on a case-by-case basis the relative weight to give the guidelines in light of other 3553(a) factors. In some cases it may be appropriate to defer to the guidelines; in others not.

United States v. Lozano, 490 F.3d 1317, 1324 (11th Cir. 2007) (internal punctuation and authority omitted). Specific characteristics of individual defendants, which courts were once prohibited or discouraged from considering should now be considered. *See* Rita v.

5

United States, 551 U.S. 338, 364-365 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental, or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the guidelines . . . These are, however, matters that section 3553(a) authorizes a sentencing judge to consider"); United States v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006) ("the other factors cited by the district court, though discouraged or prohibited departure factors under the mandatory guidelines, may be considered in applying the section 3553(a) factors under *Booker*."). In sum, the Court must conduct its own "independent review of the sentencing factors, aided by the arguments of the prosecution and the defense" and exercise discretion in imposing a sentence in this case, specific to Mr. Wood's individual circumstances, giving "consideration [to its] own sense of what is a fair and just sentence under all the circumstances." See Cavera, 550 F.3d at 189; United States v. Jones, 460 F.3d 191, 195 (2nd Cir. 2006). To be sure, "the amount by which a sentence deviates from the applicable Guidelines range is not the measure of how 'reasonable a sentence is.'" United States v. Dorvee, 616 F.3d 174, 184 (2nd Cir. 2010) (citing Gall, 552 U.S. at 46-47). Rather, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors." Id.

Here, Mr. Wood's conviction for Possession with Intent to Use a Firearm in a Federal Facility During the Commission of a Crime, supports a base level offense calculation of 6. A 6 level enhancement is applied under U.S.S.G. § 2B1.1(b)(1)(D)

because of $40,242 in damage to the Federal Reserve Building.[3] A 2 level enhancement is also applied under U.S.S.G. § 2B1.1(b)(16) due to the possession of a dangerous weapon and risk of serious bodily injury. The parties further contemplated a 2 level reduction under U.S.S.G. § 3E1.1(a) in recognition of Mr. Wood's acceptance of responsibility, resulting in a final adjusted base offense level of 12. With a criminal history category of 1 and an adjusted offense level of 12, the guidelines call for a range of 10 to 16 month in custody.

### III.   APPLICATION OF THE SENTENCING FACTORS

Application of the sentencing factors in this case strongly support the requested probationary sentence.

*(1) Nature and Circumstances of the Offense*

Mr. Wood is the first to acknowledge that his offense was not only wrong but overtly reckless in that his actions presented a significant risk of harm to the public. At the time of his offending, Mr. Wood was experiencing a major decline in his mental health and was obsessed with conspiracy theories without fully realizing or perceiving the extent of his illness. When Mr. Wood reflects on how he finds himself in this situation, he believes it was 20 years of built-up frustration that erupted in one of the worst ways possible. It gave him a sense of control in his perceived defenselessness over his health and employment.

---

[3] USSG § 2B1.1(b)(1) requires a 4 level increase for property damage ranging from $15,000-$40,000 and a 6 level increase for property damage ranging from $40,000-$95,000. The damage caused by Mr. Wood is $242 over the level increase, elevating his adjusted base level by 2 and his guideline sentence from the 6-12 month incarceration range to 10-16 months of incarceration.

7

Mr. Wood is careful to point-out that none of this excuses his offending conduct. However, Mr. Wood's mental health at the time of the offense sheds some light on his vulnerability as a result of misdirected pain and frustration. The offense was the first and only time Mr. Wood brought a weapon to work. He never intended to hurt anyone and purposely shot the gun at night to prevent injury to others. Mr. Wood's gun ownership was an effort to connect with his father who collects and tinkers with guns as a hobby.

Fortunately, Mr. Wood is healthier now and his offense is not a true reflection of who he is. When confronted by law enforcement, he immediately acknowledged his wrongful conduct and cooperated fully with the investigation. Mr. Wood resolved his case quickly and accepted a plea agreement prior to indictment. He accepted responsibility and is profoundly remorseful and embarrassed of what he did. Mr. Wood asks the Court to consider his personal history and circumstances as a more accurate measure of his character. He asks that he not be defined by his outlier decision-making and one-time criminal act.

### *(2) History and Characteristics of Mr. Wood*

A defendant's "history and characteristics" have been determined by Congress to be the principal consideration of courts in imposing sentence. 18 U.S. § 3553(a)(1). The consideration is central to the determination of what sort of sentence is needed "to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and needed "to protect the public from further crimes of the defendant." § 3553(a)(2)(C). Here, Mr. Wood's compelling personal history and individual characteristics support a probationary sentence.

As indicated above, Mr. Wood has exceptionally strong family ties, and his family is a positive source of support in his life. Mr. Wood's immediate and clear acceptance of responsibility for his offense demonstrates his amenability to probation. These, along with his solid work history and lack of any prior criminal history say much about his "characteristics," § 3553(a)(1), and the unlikelihood that he will commit "further crimes." § 3553(a)(2)(C). The Supreme Court has admonished sentencing courts to "consider every convicted person as an individual," remaining mindful that a sentence of imprisonment "may work to promote not respect, but derision, of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall, 128 S.Ct. at 598-99 (citations omitted). Congress anticipated this approach in the Sentencing Reform Act, where it expressed an expectation that imprisonment would be inappropriate and that probation would meet the requirements of 18 U.S.C. § 3553(a)(2) for certain offenders. Specifically, 28 U.S.C. § 994(J) charges the Commission with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]"  28 U.S.C. § 994(J).  The defense is cognizant of the guidelines' position on 28 U.S.C. § 994(J) when a firearm is involved and discharged, *see* U.S.S.G. § 5K2.20 (abhorrent behavior departure), however, the instant case is distinguished from the typical violent crime where a firearm is used. Here, Mr. Wood did not discharge a firearm intending to injure anyone. To the contrary, he discharged the firearm at night when he believed no one would be present in the area of the building where

he aimed and shot. Thus, the circumstances of the within offense when considered in light of Mr. Wood's mental health at the time of the offense, support a downward variance from the guidelines presumptive sentence.

Mr. Wood's actions prior to and since his criminal offending similarly buttress the appropriateness of a probationary sentence in this case. Those closest to him know Mr. Wood to have a big heart, someone who donated not only his money, but also his time to the homeless before his ITP diagnosis. Last summer, he volunteered at a local animal shelter while vacationing in Utah with his family and adopted a cat who needed a home. Mr. Wood continued to volunteer with Operation Christmas Child during his pretrial release. His love for his family, caretaking responsibilities for an aging aunt, and volunteer efforts, most of all, speak to his good and decent moral character. To be sure, the principles underlying Mr. Wood's history and character are perhaps better suggested and described within the several letters written to the Court on Mr. Wood's behalf.

### IV. PROPOSED SENTENCE

Mr. Wood's life to date, as it can be gleaned from the within Memorandum and the letters from family and friends, suggest conclusively that there is no reasonable likelihood that he will reoffend; that he is not a risk or danger to public safety; and that he is an excellent candidate for a probationary sentence as demonstrated by his perfect compliance with all court-ordered conditions of his release including pretrial supervision, no use of alcohol or substances, and completion of a mental health evaluation. In addition to meeting the expectations of the Court, Mr. Wood has participated in counseling since September

2018 and started going to church again.  While on unpaid administrative leave due to the within offense, Mr. Wood sought temporary employment opportunities through Award Staffing.  Research further supports Mr. Wood's low risk of recidivism.  According to studies completed by the United States Sentencing Commission, those with a criminal history score of zero as well as those assigned to the lowest criminal history category, like Mr. Wood, are defendants least likely to recidivate. [4]  Prior to federal charging, Mr. Wood was charged at the state level with felony-level reckless discharge of a firearm within a municipality.  The prosecution extended a plea offer for a stay of imposition on the charge and a maximum 90 day jail sentence which would have ultimately resulted in a misdemeanor conviction and 60 actual days in-custody if Mr. Wood successfully completed probation supervision.  Likewise, here, the most effective, proportional, and cost-efficient sanction to achieve the goal of sentencing is a probationary sentence allowing Mr. Wood to continue the mental health and medical treatment he needs as he works to repay restitution owed to the Government.[5]

---

[4] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, (March 2016).

[5] Federal appellate courts, including the Eighth Circuit, have recognized that payment of restitution can be a factor justifying a lesser or probationary sentence.  United States v. Oligmueller, 198 F.3d 669, 672 (8th Cir. 1999) (affirming a district court's downward departure on the basis of extraordinary restitution because "we have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution" (citing United States v. Garlich, 951 F.2d 161, 163 (8th Cir. 1991)); United States v. Miller, 991 F.2d 552, 553-54 (9th Cir. 1993) (holding that district courts may depart downward on the basis of restitution when it (1) "shows acceptance of responsibility," (2) "was substantially greater than that contemplated by the Commission when drafting section 3E1.1," and (3) "the magnitude of the departure [is] commensurate with the level of the defendant's acceptance of responsibility."); United States v. Hairston, 96 F.3d 102, 108 (4th Cir. 1996) (holding that "restitution, although taken into account in the guideline

## CONCLUSION

For all of the foregoing reasons, Mr. Wood respectfully requests that this Court impose a sentence requiring payment of a fine, a period of home detention, and to serve the statutory maximum period of probation with the condition, among others, that he follow all recommendations of the mental health evaluation. A probationary sentence reasonably provides just punishment, protects the public, promotes respect for the law, affords adequate deterrence, and supports rehabilitation. As such, it is a sentence that is "sufficient, but not greater than necessary" to fulfill the goals of sentencing as established by Congress in 18. U.S.C. § 3553(a).

Dated: April 3, 2019

Respectfully submitted,

/s/ John A. Price III
John A. Price III
Attorney at Law
MN License No. 242469
22530 Forest Ridge Drive
Lakeville, MN  55044
Telephone: (952) 469-6961

ATTORNEY FOR DEFENDANT

---

permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual'" (citation omitted)).