UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 0:18-CR-0293-1(JRT)

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CHRISTOPHER DOUGLAS WOOD,

        Defendant.

**MOTION TO TERMINATE
DEFENDANT'S REMAINING
SUPERVISED RELEASE TERM**

---

**NOW COMES** the Defendant CHRISTOPHER DOUGLAS WOOD, appearing pro se, and respectfully motions the Court to terminate the imposed term of supervised release pursuant to 18 U.S.C. §3583(e)(1) and Fed.R.Crim.P. 32.1(c)(2)(C). No hearing is sought in this matter per Fed R. Crim. P. 32.1(c)(2)(B).

**Summary**: I cannot defend my actions in this case, which were caused by a deterioration of my already bad mental health. I had become obsessed with conspiracy theories and believed that my actions were my only recourse to regain some sort of power over a system that oppressed.

I've spent several years now in therapy and I do not even recognize today the man I was when I took a shot at the Federal Reserve building in 2018. I've done well on my years of supervision and, for the reasons stated in this motion, request that my final year of supervision be terminated.

1

RECEIVED BY MAIL

JAN 03 2022

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA



SCANNED
JAN 03 2022
U.S. DISTRICT COURT MPLS

## Case History

I was suffering for several years leading up to my crime. I was diagnosed with idiopathic thrombocytopenic purpura (ITP), which caused me to struggle with insomnia and depression. I self-medicated with alcohol for a while, but that seemed to make this worse and I quit the alcohol. As many addicts do, however, I replaced one addiction for another.

This was more sinister; I became addicted to conspiracy theories and dove head-first down the rabbit hole that is online conspiracies. This all culminated in a stupid action where I shot at the Federal Reserve building in Minneapolis, breaking a window with my shotgun slug and causing other damage inside the mostly empty building.

I was charged in a felony information for my actions on November 30, 2018, and waived indictment on December 17, 2018. See Docs. 1 & 6.[1] I readily accepted responsibility for my actions and pleaded guilty to one count of Possession with Intent to Use a Firearm in a Federal Facility During the Commission of a Crime[2] when I waived indictment on December 17, 2018. Doc. 7

Although I plead guilty quickly, it was agreed-upon between my defense counsel and the government that I would receive only a two-point deduction for acceptance of responsibility. My adjusted offense level was calculated at 12 (see Gov. Position on Sentencing, Doc. 17 at *3), and this Court sentenced me on May 9, 2019 to 4 months of incarceration, 4 months of home detention, and 3 years of supervised release.

---

1   "Doc." or "Docs" references the docket entry number in this Court's PACER record.

2   In violation of 18 U.S.C. §930(b).

2

Just after beginning my term of incarceration, the probation department moved to modify my conditions of supervised release [Doc. 30] to allow for community confinement placement because it was possible I'd be evicted from my apartment during that confinement. However, this did not come to pass and I did not use this halfway house time. I remain living in the same apartment that I've lived in for many years now.

I completed my term of incarceration in county jail and began my term of supervised release (and home detention) on October 11, 2019. I completed my term of home detention and location monitoring on February 10, 2020, just before the COVID-19 pandemic lock-downs began.

Other than forfeiture of property, no other entries appear on my docket since this modification of supervision.

## **Authority and Procedure**

18 U.S.C. § 3583(e)(1) states that, after considering most of the § 3553(a) sentencing factors, the Court may terminate a term of supervised release and discharge the defendant after serving one year of supervision. It may do so if early termination is warranted by the conduct of the defendant and it is in the "interest of justice".[3]

This process is governed by Fed.R.Crim.P. 32.1(c) which allows modification of supervised release. In general, a hearing is required before any modification of supervised

---

3   §3553(a)(2)(A) is missing from the cross-referenced factors.

release conditions or terms is made. However, an exception to the hearing requirement is made specifically for instances where the relief sought is favorable to a defendant and the government has been given reasonable opportunity to respond. I have waived my right to a hearing and early termination, certainly, qualifies as favorable to me.

## Precedent Law

The purposes of supervised release have been variously described as rehabilitation, deterrence, training and treatment, protection of the public, and reduction of recidivism. *See United States v. Johnson,* 529 U.S. 53, 59-60 (2000).

"The Supreme Court has described supervised release as "the decompression stage" between prison and full release." *United States v. Kappes*, 782 F.3d 828 (7th Cir. 2015) (Quoting *Johnson* at 709).

In the Eighth Circuit, decisions on early termination of supervised release are controlled by *United States v. Mosby,* 719 F.3d 925 (8th Cir. 2013).

> "Under 18 U.S.C. § 3583(e), a district court 'may, after considering [certain] factors…terminate a term of supervised release and discharge the defendant…if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice.' We review for abuse of discretion a district court's denial of a motion to modify the terms of supervised release, *United States v. Davies*, 380 F.3d 329, 332 (8th Cir. 2004), including a motion for early termination of supervised release under § 3583(e)… We afford the district court "broad discretion" in this area, *Davies*, 380 F.3d at 332, recognizing that it is in the best position to evaluate the circumstances of each individual defendant." *Id.* at 930.

4

## Policy Overview

Policy on early termination on supervised release comes from two sources: the U.S. Sentencing Commission and the Judiciary Committee on Criminal Law.

Sentencing Commission Policy: U.S.S.G. §5D1.2 specifically speaks about the term of supervised release. Application note 5 was added in 2011 which, for the first time, addressed early termination of supervised release and established policy to encourage the use of early termination in appropriate cases.

This change was a direct response to the decision in *Tapia v. United States,* 546 U.S. 319 (2011). That decision held that sentences of incarceration could not be lengthened to facilitate rehabilitation because that sentencing goal is reserved as within the realm of supervised release. The hefty liberty infringement posed by incarceration, Justice Kagan reasoned, are inappropriate for use to rehabilitate. This is especially so when supervised release was implemented by Congress to balance incapacitation needs with rehabilitation needs.

Congress specifically intended incarceration to serve incapacitation and punishment goals, and conversely intended supervised release to serve rehabilitation goals. This is clear to see when one considers the cross-references of §3583(e) to the sentencing factors. As noted above, §3553(a)(2)(A) is missing from that list and that omission is intentional because Congress did not intend for supervised release to serve as

5

punishment or to reflect the severity of the offense.

Rather, its use is to transition or "decompress" a defendant from prison act as the rehabilitative term of a sentence between incarceration and full freedom. *Johnson v. United States,* 529 U.S. 694, 709 (2000). Congress' intent with supervised release was stated explicitly and on the record by the Senate Judiciary Committee in its report on the Sentencing Reform Act.[4]

The amendment to §5D1.2 (Amendment 756) change policy to encourage the use of longer terms of supervised release to facilitate rehabilitation This use of longer supervision sentences was balanced with a (new) presumption that early release should be used as a normal function to account for the completion of rehabilitation goals.

This policy shift by the Sentencing Commission is important, as it changes the *de facto stare decisis* in many district courts to only granted early termination in exceptional cases where "exceptionally good conduct" and "changed circumstances" existed. These standards trace back to an appellate decision from the Second Circuit over 20 years ago.[5]

This standard permeated through the rest of the appellate circuits in the intervening years. Today, however, this standard no longer reflects post-*Tapia* policy

Judiciary Policy: The Judiciary Committee on Criminal Law promulgates its own policy on supervised release, specifically for the United States Probation Office to guide their probation offices on the supervision of federal offenders. This document is referred to as

4  Senate Report: Sentencing Reform Act of 1983: Report of the Committee on the Judiciary; No. 98-225 at 125.

5  *United States. v. Lussier,* 104 F.3d 32 (2nd Cir 1997)

6

Monograph 109, Volume 8, Part/Chapter E. However, it has has been renamed multiple times in the last decade. In 2012 it was renamed to "Supervision of Federal Offenders," and again in 2018 was renamed to "Post-Conviction Supervision".

Each revision came with its own policy changes, but the most recent revision (Transmittal 080-40; July 2, 2018) was the most substantial change to the supervision of released federal inmates since supervised release began. A lengthy discussion of this change was made by Hon. Judge Christine M. Arguello in the District of Colorado a few months ago, and was better said there than I could possibly articulate myself:

> "In a letter issues to the United States District Court Judges, Magistrate Judges, Federal Public Defenders, Chief Probation Officers, Chief Pretrial Services Officers, and Circuit Librarians, the Judicial Conference explained these revisions, several of which are relevant here:
>
> • The title was changed from "Supervision of Federal Offenders" to "Post-Conviction Supervision."
>
> • While the formal Guidance already included reference to evidence-based practices, the revised policy explicitly establishes evidence-based practices as the overall governing framework for effective supervision.
>
> • "Lawful self-management" was added as a goal of supervision. The term is defined as "the person's demonstrated ability to not commit a crime during the period of supervision and beyond." The revised policy further explains that the justice system cannot coerce a person to act lawfully and that "the goal for each person under supervision is lawful self-management (i.e., making personal choices not to engage in criminal behavior)."
>
> • The current model of "controlling" and "correctional" strategies was replaced by "monitoring, restrictions and interventions."

7

*United States v. Shaw*, No. 11-CR-406-CMA-2 (D. Colorado, March 5, 2020). For a defendant who has served over 18 months on supervised release before requesting early termination, this policy states that there is a presumption in favor of recommending early termination for those who meet six criteria:[6]

> (1) The person does not meet the criteria of a career drug offender or career criminal (as described in 28 U.S.C. §994(h)) or has not committed a sex offense or engaged in terrorism;
>
> (2) The person presents no identified risk of harm to the public or victim;
>
> (3) The person is free from any court-reported violations over a 12-month period;
>
> (4) The person demonstrates the ability to lawfully self-manage beyond the period of supervision;
>
> (5) The person is in substantial compliance with all conditions of supervision; and,
>
> (6) The person engaged in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision.

None of these criteria require conduct outside of normal compliance to warrant early termination. All of them do, however, support the idea that post-*Tapia* policy is to treat compliant conduct as sufficient to warrant early release. Even if pre-*Tapia* standards were applied here, the significance of these policy changes constitute "changed circumstances," sufficient to warrant early termination considerations.

---

6  Monograph 109: Post-Conviction Supervision, §360.20(a)(1)-(6)

8

## Discussion of 18 U.S.C. §3553 Factors

The nature and circumstances of my crime are at issue here, even if the seriousness of that conduct is not. They implicate my history and character which makes this sentencing factor immutable. I cannot, and will not, defend my actions that created this case. I also do not minimize or defend my conduct in this case. However, this does not make me irredeemable. I have changed as a person and have demonstrated this change throughout my period of supervised release. I am no longer the person who was sentenced.

I have spent years now in therapy to address the underlying depression issues that sent me down the path to buy into conspiracies as an addiction. I'm in a much better mental state now than I have been in quite a few years. See §3553(a)(1).

As discussed above, subsection (a)(2)(A) is not appropriate for consideration here because the seriousness of my offense, the need to punish and promote respect for the law are only applicable to prison sentences, not to supervised release. Subsections (a)(2)(B)-(D), however, are highly applicable here and deserve review.

This was an unusual circumstance for me and my actions in this case do not represent me as a person over the 46 years of my life. The letters of character reference submitted at sentencing tell that story well. I am appalled and ashamed of my actions here, and I can do nothing but refrain from them again for redemption. I'm committed to better mental health now, and am of no risk of re-offending.

Beyond that promise, though, are statistics that show I am of quite low risk to be

9

re-arrested or re-convicted of a new offense. A recent study published by the Sentencing Commission on recidivism data shows that offenders like me, who are in their 40s with a Criminal History Category of I, are re-convicted of new crimes 40% less often than offenders 21 and younger in the same criminal history category.[7]

Another study shows that offenders sentenced in Criminal History Category of I, with no prior police interaction, re-offend 5x less often than offenders sentenced in Criminal History Category of VI.[8]

I have no needs, educational, medical, or otherwise which could be facilitated from further supervision. I live well off the retirement income I derive from 20 years working for the U.S. Postal Service. I also work now at Goodwill, helping with intake of donations. Thus, (a)(2)(B)-(D) all weigh in favor of early termination here.

The kinds of sentences available to me, and the ranges established for my sentence by the Guidelines Manual, is relevant only as a jurisdictional question. §3583(b) limits terms of supervised release to a maximum of 3 years for a Class D felonies like mine.

The Guidelines Manual recommends 1-3 years of supervised release. U.S.S.G. §5D1.2(a)(2). With two years already served, I fall within the acceptable ranges of sentences available for early termination under the guidelines.

Policy changes have been exhaustively covered, but not how they apply to me. This is discussed more in the following section.

---

7   Recidivism of Federal Offenders Released in 2010; U.S. Sentencing Commission (Sep. 2021).

8   The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders; United States Sentencing Commission.(2017)

Other defendants who have had their supervised release terms terminated early directly speak to §3553(a)(6), especially in context of revised policy regarding the use of early termination.

To avoid unwarranted disparities between my case, and those of the similarly-situated defendants above (who have had their supervision terminated early), subsection (a)(6) promotes early termination here.

Although I am not aware of any other defendants charged with §930(b), there are other, similar defendants who have had their terms of supervised release terminated early. In *United States v. Smith,* No. 0:03-CR-094 (D.Minn. Nov. 23, 2020), Defendant Smith had his term of supervised release terminated about 6 months early. Smith had been convicted of possessing a firearm as a felon and was given 5 years of supervised release to serve.

In *United States v. Zimmerman,* No. 0:06-CR-020 (D.Minn. Feb. 10, 2011), Defendant Zimmerman released from supervision a year early By Hon. Ann Montgomery after a conviction for accepting bribes as a public official landed him on supervised release for 3 years.

In this Courtroom early termination has been granted in the past as well. See *United States v. Davis,* No. 0:04-CR-123 (D.Minn. Oct. 9, 2009) and *United States v. Sipple,* No. 0:00-CR-060 (D.Minn. Apr. 7, 2010).

Finally, for restitution considerations (see §3553(a)(7)), I have paid off my restitution just this month, and the check cleared my account on December 21st.

11

I ask for and expect no sympathy from this Court for the punishment I received for my actions. The sentencing factors discussed here show clearly that early termination in this case is in the interests of justice. Granting this request is fair and just.

## Discussion of Relevant Policy Considerations

I meet the criteria for early termination of supervised release by policy as well as by the statutory factors already discussed.

While the policy of the Sentencing Commission, as it relates to my case, have been discussed, the application of Judiciary policy has not.

I am a first time offender, and not a sex offender or a terrorist, so I qualify under criteria (1) as determined by the Judicial Conference.

I present no risk to anybody in the community and I have no violations of supervision for the over two years I have spent on it. I have demonstrated my ability to live my life lawfully, fully self-managed, and I am in full compliance with all conditions of my supervised release, including the special conditions thereof.

I have a fantastic support structure, as this court observed at sentencing where support was expressed to this Court for me. My prosocial activities and support are very good.

Finally, one of the most recent figures from the Administrative Office of the United States Courts estimates that it costs American taxpayers $3,347.41 per year per

12

defendant for probationary supervision.[9] In my case, there are no benefits that could be achieved over the next 10 months to justify such an expense.

## **CONCLUSION**

Considering the cost of supervision, and based upon the reasons and factors discussed in this motion, I respectfully request that this Court terminate the remainder of my term of supervised release.

Respectfully submitted on this _30th_ day of _December_, 2021.

CHRISTOPHER DOUGLAS WOOD
Pro Se Defendant, Movant

---

9   Administrative Office of the United States Courts report on the supervision costs vs. incarceration costs, published July 18, 2013.

13